NEHEMIAH O. PILLSBURY, assignee &c.,

*v.*

JANE A. KINGON.

The complainant acted as the mutual friend of the defendant and her father in effecting the exchange of a dwelling-house in Brooklyn owned by the defendant, for a store and a dwelling-house in Montclair, owned by her father (the latter occupied as his home), especially in fixing the relative values of the properties and the basis for their exchange, and urged it as advantageous to both parties.    The father was about to make an assignment for the benefit of his creditors, and the complainant was at that time suggested as and he expected to be the assignee.    The exchange was made on December 16th, 1877, and the assignment (which was made to the complainant) was

made on January 14th, 1878. The defendant took possession of and occupied the Montclair property at once, her father also living there with her; and after the assignment she expended about $2,000 in improvements thereon, as complainant then knew. Learning that her father's creditors were dissatisfied with the exchange, the defendant and her husband offered to re-exchange, if paid for her improvements, but the complainant, then assignee, did not accept the offer. The complainant, as assignee, collected the rents from the Brooklyn property, but allowed the taxes and interest on the mortgages thereon to remain unpaid, and the premises were afterwards, under foreclosure, to which the complainant was a party, sold to a third person.—*Held*, that the complainant was not entitled to a decree setting aside the exchange as fraudulent against the father's creditors, and that while his conduct in the exchange before the assignment, did not (of course) bind the creditors whom, as assignee, he represented in the suit, yet it showed that the exchange was made in good faith.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. F. Adams,* for complainant.

*Mr. J. H. Ackerman,* for defendant.

THE CHANCELLOR.

This suit is brought by Nehemiah O. Pillsbury, as assignee of John C. Doremus (now deceased), under the act " to secure to creditors an equal and just division of the estates of debtors who convey to assignees for the benefit of creditors," originally against Jane A. Kingon and her husband (but he is now dead), to set aside an exchange of properties made December 16th, 1877, by and between Mr. Doremus and Mrs. Kingon, his daughter. Mr. Doremus's property consisted of his homestead and store (two different places) in Montclair, in Essex county, and Mrs. Kingon's was a brown-stone front three or four-story house in Brooklyn. The Montclair property, at the time of the exchange, was mortgaged for $8,000, and the Brooklyn property for $5,000. The former property was in the exchange valued at $12,000, and the latter at $11,000. For the difference Mr. Doremus gave Mrs. Kingon a mortgage for $2,000 on the Brooklyn property. Mr. Doremus made an assignment to Mr.

Pillsbury, the complainant, for the equal benefit of his creditors, January 14th, 1878, about a month after the exchange. The bill claims that the transfer of the Montclair property to Mrs. Kingon was fraudulent as against the creditors of Mr. Doremus, that it was made in view of the intended assignment, and in fraud of it, and was designed to protect the property of Mr. Doremus from his creditors. He died December 28th, 1879. Immediately after the exchange Mrs. Kingon took possession of the Montclair property (the deeds were recorded within a very few days after the exchange was made), and continued thenceforward to occupy it as owner. She made necessary and valuable improvements to the homestead at a cost of about $2,000. After the assignment the complainant took the rents of the Brooklyn property, but paid neither principal nor interest on either of the mortgages thereon, nor the taxes on the property. He knew all about the exchange and the circumstances thereof. He was the confidential friend of Mr. Doremus, and appears not only to have advised him in the matter, but to have strongly favored the exchange and to have urged it on both parties; on Mr. Kingon as being the means of aiding his father-in-law by securing to him in his old age a home in the homestead with his daughter, and on Mr. Doremus as being not only advantageous to him, but to his creditors also. It appears by the evidence that the complainant did much towards fixing the price at which the properties were taken in the exchange. In September, 1878, and before the Brooklyn property was sold under foreclosure as hereinafter mentioned, Mr. and Mrs. Kingon (the assignee was appointed in January preceding) having learned that the creditors of Mr. Doremus were dissatisfied with the exchange, through their attorney offered the complainant to convey the Montclair property to him, on receiving from him a conveyance of the Brooklyn property and payment for the improvements they had put on the former; but the offer was not accepted. The first mortgage on the Brooklyn property was forclosed by suit because of non-payment of interest, and the property was sold September 27th, 1878, to Duncan D. Chaplin. To that suit the complain-

ant was a party. After the sale, and on the 1st day of October following, he filed the bill in this cause.

Mrs. Kingon gives the history of the exchange. On the 1st of October, 1877, she and her husband were residing in the city of New York. On that day she was called by a telegram to Montclair to see her mother, who was very ill. She went there to stay a week, but after the week remained there on account of her mother's illness. Her husband followed her, and they were still living with her father and mother in the homestead in December following, when her mother spoke to her about coming there to live with them, and her father proposed to her husband to buy the homestead, which proposal was not accepted; Mr. Kingon saying he had New Jersey property enough. A short time afterwards they again spoke of the matter, and on that occasion the complainant and Mr. Van Gieson, her father's lawyer, were also present and took part in the conversation. An exchange of the Brooklyn for the Montclair property was then talked about, and also the subject of an assignment which her father proposed to make of his property for the benefit of his creditors; and it appears that it was contemplated that the complainant should be the assignee. She says the Brooklyn property was worth as much as the Montclair property; that her father said he would not make any transfer unless it gave his creditors as much as if he retained the Montclair property; that her husband suggested that the complainant should go and look at the Brooklyn property, and the latter promised to do so; that her father knew that property well; that he had often been there; that an appointment was then made for the complainant to meet her husband at the office of the latter in New York the next day; that her father held his property at a price higher than that at which the complainant and Mr. Van Gieson estimated it, and that the price of the Brooklyn property was fixed by the complainant, and that of the Montclair property by the complainant and Mr. Van Gieson. Mr. Van Gieson testifies that Mr. Kingon, speaking for his wife, was somewhat loth to make the exchange. He says the impression he got from the conversation at the time was, that Mr. Kingon was under the convic-

tion that he was not getting value in the exchange of properties. He further says that the complainant was very much in favor of the exchange, and advised it as a friend; that it was urged on Mr. Kingon in this way to provide a home for Mr. Doremus in Montclair (his wife was ill and died three days after the exchange); that the complainant advised an exchange of the properties, pointing out among other things the advantage of Mr. Doremus having a home in Montclair; that the idea, as he understood it, was that Mr. and Mrs. Kingon would reside in Montclair; that they contemplated a residence there, and that Mr. Doremus, who much preferred residing there to living in a strange place, should have a home with them. It also appears from his testimony that the complainant said, though perhaps not at that time, that the exchange would be beneficial to the creditors of Mr. Doremus; that the Brooklyn property, which would pass to him as assignee when the assignment should be made, was worth more to the creditors than the Montclair property. While the complainant as assignee—in his representative capacity —is not bound by these statements or actions of his in the exchange, they are competent and important evidence of the character and design of the transaction, and go very far, indeed, to repel the idea of the existence of any fraudulent intent. He was acting as the friend and adviser of Mr. Doremus, and, to a certain extent, of Mr. and Mrs. Kingon also. Both parties appear to have had great confidence in his judgment and candor. The exchange was not made secretly or hastily, but after full negotiation and consideration, and with care and circumspection, and as soon as it was made the deeds were put on record. The proof is that the Brooklyn property was valuable, the situation and neighborhood very good, and the house well built. It was rented for $600 a year. One of the witnesses speaks of its contiguity to Prospect Park as an element of value. The witnesses who give their opinion of its value at the time of the exchange, vary in their estimates, one fixing it at about $7,000, another at from $7,500 to $8,500, and another at $10,000. It is to be remembered in connection with these estimates, that when the exchange was made it had been mort-

Pillsbury v. Kingon.

gaged for $10,000, $5,000 of which had been paid, and that the complainant in his inventory valued it at $10,000. He says, however, that it was on the representations of Mr. Kingon, but Mr. Kingon is dead, and it appears that the complainant, at the time of the exchange, took pains to inform himself of the value of the property, and, to say the least of it, did very much towards fixing the price at which Mr. Doremus took it. As to the Montclair property, the witnesses vary in their estimates of its value. The complainant estimates the value of the homestead at $8,000, another witness at $9,000, and another at $10,000. They also vary in their estimates of the value of the store. The complainant and another witness fix it at $5,000, and another at $6,000. On the other hand, on the part of the defendant, Mr. Van Gieson puts the value of the homestead at from $4,000 to $5,000, and that of the store at $3,000; and Mr. Van Riper values the homestead at from $7,000 to $8,000, and the store at from $3,000 to $4,000. When the exchange was made it was at a time of stagnation in the real estate market, and consequent depression in values. There is no proof of any fraudulent design on the part of Mrs. Kingon, nor is any to be imputed to her. But further, the improvements which she made to the Montclair property were put upon it after the assignment was made, and the assignee had knowledge that she was spending her money on the property in those improvements. He admits that they were in progress to his knowledge while he was contemplating bringing this suit. In September, 1878, she proposed to him to convey the property to him on condition that he would convey the Brooklyn property to her and pay her for those improvements, but he practically rejected the proposition by giving no reply to it. He made no effort to sell the Brooklyn property, though it appears that he might have sold it; for Mr. Carman testifies that in the spring 1878 inferior properties in the same neighborhood were sold at private sale at $8,000 apiece, and he says that the property in question was better worth $10,000 than they $8,000. Having got all the rent he could from the Brooklyn property, paying neither taxes nor principal or interest of the mortgages, the complainant let the first mortgage on it go to foreclosure and sale, and then, after

the property had been sold under the foreclosure, began this suit. It is clear that the creditors have no claim to any relief in equity. The bill will be dismissed, with costs.